UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **KIMBERLEY DIAMOND-BROOKS;** § | |
| **AND VALERIE ANN GONZALES,** § | |
| § | |
| *Plaintiffs*, § | |
| § | |
| v. § | **CIVIL ACTION NO. 12-cv-3482** |
| § | |
| **CITY OF WEBSTER, TEXAS;** § | |
| **CHIEF RAY SMILEY; AND** § | |
| **RAYMOND BERRYMAN,** § | |
| § | |
| *Defendants*. § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Defendants City of Webster, Texas ("the City" or "Webster"), Chief Ray Smiley ("Chief Smiley"), and Officer Raymond Berryman's ("Officer Berryman") Motion for Summary Judgment. (Doc. No. 21.) After considering the Motion, all responses thereto, and the applicable law, the Court finds that the Motion must be **GRANTED IN PART** and **DENIED IN PART**.

**I.  FACTUAL BACKGROUND**

This lawsuit arises from a police officer-involved shooting at a nightclub in Webster, Texas. On February 27, 2011, at 1:13 a.m., two Webster Police Department officers—Officer Berryman and Sergeant Mark Rawls ("Sgt. Rawls")—were dispatched to Club Eden on reports that a fight had broken out between two patrons there. When the officers arrived at the club, Sgt. Rawls initially stopped to speak with an employee of the club, while Officer Berryman proceeded further into the club. From that point, there are competing versions of the facts, which will be discussed in more detail below. But it is undisputed that, within minutes of his arrival at Club Eden, Officer Berryman withdrew his service weapon, which subsequently discharged in

1

the direction of Plaintiff Kimberley Diamond-Brooks ("Ms. Diamond-Brooks"). The bullet entered Ms. Diamond-Brooks's face, traveled along her jawline, and exited the back of her neck. Upon exiting Ms. Diamond-Brooks, the bullet then grazed the cheek of Plaintiff Valerie Ann Gonzales. Officer Berryman contends that the shooting was accidental. Plaintiffs counter that Officer Berryman intentionally discharged his weapon.

## II.     PLAINTIFFS' CLAIMS

Plaintiffs assert that Officer Berryman used excessive force against them in violation of their Fourth Amendment right to be free of unreasonable seizures. (Doc. No. 1-1 ("Pet.") at ¶ 6.) Separately, Plaintiffs assert claims against Chief Smiley and the City for ratifying Officer Berryman's actions.[1] (*Id.* at ¶ 14). Plaintiffs seek monetary damages under 42 U.S.C. § 1983 ("Section 1983") and attorney's fees under 42 U.S.C. § 1988. (*Id.* at ¶¶ 15-16.)

## III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants seek summary judgment on all of Plaintiffs' claims. As to the claims against Officer Berryman, Defendants argue that he accidentally discharged his weapon at Club Eden, and that an unintentional shooting cannot constitute an unreasonable seizure or a deprivation of substantive due process as a matter of law. (Doc. No. 21 ("Mot."), at 5-10.) Defendants

---

[1] Plaintiffs' state court petition also claimed that Officer Berryman deprived them of their right to bodily security and liberty under the Fourteenth Amendment (Pet. ¶ 9); and that Chief Smiley and the City violated their constitutional rights by promulgating "an arrest policy, habit, custom, and/or practice" which authorized Officer Berryman's use of excessive force and by failing to adequately train Officer Berryman (*id.* at ¶¶ 7-8, 12-13). Plaintiffs' opposition to Defendants' Motion makes no reference to these bases for liability. The Court understands these claims to have been abandoned. *See Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998) (party opposing summary judgment "may not rest upon the mere allegations or denials of its pleadings," but must "adduce evidence sufficient to support a jury verdict"); *see also Carroll v. City of Dallas, Tex.*, No. Civ. 3:04CV2640-H, 2005 WL 3543347, at *7 (N.D. Tex. Dec. 28, 2005) (party's failure to respond to summary judgment on a particular issue is "tacit abandonment of the claim").

additionally argue that Officer Berryman is entitled to qualified immunity. (*Id.* at 11-14.) As to Plaintiffs' claims against Chief Smiley, Defendants argue that Chief Smiley was neither a participant in nor a cause of Officer Berryman's use of deadly force. (*Id.* at 10-11.) They also urge that Chief Smiley, like Officer Berryman, is entitled to qualified immunity. (*Id.* at 11-14.) Finally, Defendants assert that there is no basis for holding the City of Webster liable for Officer Berryman's actions. They contend that no policy or custom, adopted by or known to an official policymaker of the City, was the moving cause of Officer Berryman's use of deadly force. (*Id.* at 15-20.) They also argue that the theory of municipal "ratification"—to the extent it is accepted in the Fifth Circuit—does not apply on the facts of this case. (*Id.* at 20-24.)

## IV.  LEGAL STANDARD

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(a). "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 210 (5th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted).

"Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party." *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007). The Court may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence

to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 300 (2d ed. 1995)). Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. FED. R. CIV. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

V.   ANALYSIS

   A.   **Fact issues preclude summary judgment on Ms. Diamond-Brooks's Fourth and Fourteenth Amendment claim**

The Fourth Amendment to the Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The Supreme Court has held that a police officer's use of force may constitute a seizure under the Fourth Amendment. *See Tenn. v. Garner*, 471 U.S. 1, 7 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person."). But an act of force does not implicate the Fourth Amendment unless it is intentional. *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97 (1989) ("[A] Fourth Amendment seizure . . . [occurs] only when there is a governmental termination of freedom of movement *through means intentionally applied*.") (emphasis original); *see also Santibanes v. City of Tomball, Tex.*, 654 F.

4

Supp. 2d 593, 602 (S.D. Tex. 2009) ("[O]nly intentional conduct of government actors invokes the protections of the Fourth Amendment."). Consequently, if a police officer accidentally discharges his service weapon and injures—or even kills—another person, the shooting may constitute a tort. But it cannot constitute a seizure for purposes of the Fourth Amendment. *See Watson v. Bryant*, 532 Fed. App'x. 453, 457 (5th Cir. 2013) (concluding that, in the absence of evidence that police officer intended to use deadly force, "the negligent shooting here did not itself violate [the plaintiff's] Fourth Amendment rights").

### 1. Defendants' own summary judgment evidence indicates a fact issue

Officer Berryman reports that he never intentionally discharged his weapon at Club Eden on February 27, 2011. The following description of events is recorded in a notarized memorandum drafted by Officer Berryman to Chief Smiley on the day of the shooting.[2]

According to Officer Berryman, upon arriving at the club, he observed two people actively fighting.[3] The lighting was poor, and the area around the fight was crowded. Officer Berryman claims that he attempted to break up the fight, but that one participant—later identified as Michael Maximus Roman ("Ms. Roman")—became physically aggressive towards him. Sgt. Rawls arrived and took Ms. Roman to the ground. When she tried to stand back up, Officer Berryman withdrew his taser and deployed it to Ms. Roman's abdomen area.[4] Officer Berryman observed that the taser did not work effectively and that Sgt. Rawls continued to struggle to subdue Ms. Roman.

---

[2] (Doc. No. 21-2, at 61-62.)

[3] According to the police report, the officers arrived at Club Eden at approximately 1:14 a.m. (Doc. No. 21-2, at 48.)

[4] According to the police report, Officer Berryman's taser was deployed at approximately 1:15 a.m. (Doc. No. 21-2, at 38-39.)

At that point, Officer Berryman claims, an unknown person placed his or her arm around his neck from behind and started to pull him backwards. Officer Berryman states that his head was pulled upwards due to the force being applied by the person behind him. He claims that he was unable to turn, and that he could not speak or inhale. He feared losing consciousness. Officer Berryman then reholstered his taser and withdrew his service weapon, a Glock Model 22. He reports that people began grabbing at his right arm and hand, which held the pistol. He states that the gun discharged once, but that he does not believe he pulled the trigger.[5]

Officer Berryman's account is corroborated, to some extent, by Sgt. Rawls. The Court has been provided a report composed by Sgt. Rawls several hours after the shooting.[6] When Sgt. Rawls joined Officer Berryman inside Club Eden, he observed Officer Berryman struggling with Ms. Roman. He confirms that the lighting was poor, and that patrons were crowded around Officer Berryman and Mr. Roman. He states that he knocked Ms. Roman to the ground, as reported by Officer Berryman. He also states that Officer Berryman deployed his taser on Ms. Roman, after which Sgt. Rawls attempted to place Ms. Roman under arrest.

At this point, Sgt. Rawls's and Officer Berryman's accounts diverge. Sgt. Rawls reports that another female—later identified as Plaintiff Kimberley Diamond-Brooks[7]—ran toward him and struck him on his right side while yelling, "Leave her alone!" Sgt. Rawls then attempted to place Ms. Diamond-Brooks in custody. During this process—which he reports Ms. Diamond-Brooks resisted—Sgt. Rawls heard the gunshot and scanned the area for its source. He observed

---

[5] According to the police report, shots were fired at approximately 1:16 a.m. (Doc. No. 21-2, at 51.)

[6] (Doc. No. 21-2, at 27-28.)

[7] In the police report, Ms. Diamond-Brooks is referred to as "Kimberley Roman." To reduce confusion with Ms. Michael Maximus Roman, the Court will refer to Ms. Diamond-Brooks by the name used in her state court petition.

Officer Berryman "with his sidearm at the low ready." Sgt. Rawls states that patrons were behind Officer Berryman and appeared to be pushing him. Sgt. Rawls does not claim to have observed any individual choking Officer Berryman from behind.

Defendants also attach to their Motion four witness statements procured shortly after the shooting. (Doc. No. 21-3, at 1-11.) Although each witness describes, to varying levels of detail, the scuffle between a woman with tattoos on her neck (ostensibly Ms. Roman) and one or two police officers (Officer Berryman and Sgt. Rawls), as well as Ms. Roman's subsequent tasering, no witness reports that Officer Berryman was placed in a chokehold by a patron. No witness corroborates that patrons began pulling on Officer Berryman's arm and hand after he withdrew his gun. And no witness saw Ms. Diamond-Brooks struggling with Sgt. Rawls prior to being shot, as Sgt. Rawls claims.

The Court has reservations about whether this evidence carries Defendants' burden. On summary judgment, Defendants must show the Court that there exists "no genuine dispute as to any material fact" for a jury to try. FED. R. CIV. P. 56(a). But the Defendants' own evidence, taken in the light most favorable to Plaintiffs, suggests a genuine issue of material fact that must be tried to a jury. It is undisputed that Officer Berryman withdrew his weapon; that the weapon was functioning properly; and that the weapon was in his hand when it fired at Ms. Diamond-Brooks, only a few feet away. From this alone, it would be fair to infer that Officer Berryman intended to fire his weapon. *See Santibanes*, 654 F. Supp. 2d at 604 (noting that, in absence of malfunction, "the only logical explanation for [the weapon's] discharge is that [the officer defendant] applied force to its trigger mechanism").

To defeat this inference, Defendants rely on Officer Berryman's testimony that someone else in the crowd operated the trigger to his weapon or caused him to operate the trigger to his

7

weapon. Although a jury could find Officer Berryman not credible, this possibility alone may not be enough to create a fact issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986) ("[D]iscredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion.") (quotation marks and citation omitted). But Officer Berryman is not the only available source of information for the events in question. His own account recognizes that a bar full of people were present when the shot was fired. Written statements from four of these witnesses are included in Defendants' summary judgment evidence, as are summaries of statements from at least a dozen others.[8] And no one corroborates Officer Berryman's testimony that patrons were grabbing at his arm and hand after he withdrew his weapon. Indeed, one eyewitness, Ms. Gonzales, reported that, while there was a "group of people . . . behind the girl that got [tased]," there was "no group around the officers." (Doc. No. 21-3, at 8.)

Additionally, there are inconsistencies between Sgt. Rawls's and Officer Berryman's accounts which cast doubt on Officer Berryman's assertion that someone else caused the gun to fire. According to Sgt. Rawls's narrative, he was struggling with Ms. Diamond-Brooks when the gunshot went off. (Doc. No. 21-2, at 27.) When he heard the pop of gunfire, however, he immediately "scanned" the area and saw Officer Berryman. (*Id*.) Subsequently, the woman next to him—Ms. Diamond-Brooks—fell to the ground. (*Id*.) Taking this testimony in logical sequence, Sgt. Rawls was not looking at Officer Berryman when the gun went off, but had eyes on him almost immediately afterward, before Ms. Diamond-Brooks had even reacted to being shot. Yet he did not see Officer Berryman in a chokehold, and he did not see anyone holding or

---

[8] The Court acknowledges that many of these witnesses indicated that they did not see the shooting itself. At least one witness, however, appears to have been watching Officer Berryman at the time the shot was fired. This witness stated that Officer Berryman told Ms. Diamond-Brooks to "stay back," and then "pulled his side arm and shot [her]." (Doc. No. 21-2, at 32.)

8

grabbing Officer Berryman's arm. At most, he observed patrons pushing Officer Berryman forward. (*Id.*)

Due to these inconsistencies, as well as the failure of any eyewitness to corroborate Officer Berryman's testimony that one patron had put him in a chokehold while others grabbed his weapon arm, the Court is not satisfied that Defendants have met their burden on summary judgment—to show no factual dispute exists as to whether Officer Berryman intentionally fired his weapon. Even if they had, however, this would simply shift the burden to Plaintiffs to produce some evidence to put the factual issue back in play. The Court thus turns to Plaintiffs' opposition evidence.

### 2. Ms. Diamond-Brooks has demonstrated a fact issue as to Officer Berryman's intent

The Court begins with the affidavits of Plaintiffs, Ms. Diamond-Brooks and Ms. Gonzales. Unfortunately, these accounts are lacking important details necessary to understand the events being described. Most notably, Ms. Diamond-Brooks and Ms. Gonzales fail to distinguish between Sgt. Rawls and Officer Berryman in their narratives. (Doc. No. 27-2, at 2, 5.) Indeed, it is unclear whether Ms. Gonzales even knew there were two officers present on scene. (*Id.* at 5.) So, while it is clear that both women were looking at one of the officers immediately preceding the gunshot, the Court cannot eliminate the possibility that they were looking at Sgt. Rawls and therefore could have failed to see Officer Berryman in a chokehold.

Other affidavits supplied by Plaintiffs are more straight-forward. Three eyewitnesses—Ashley Rasmussen, Amanda Jacobs, and Amber Williams—claim to have seen Officer Berryman pull his weapon and shoot Ms. Diamond-Brooks. (Doc. No. 27-2, at 8-9, 12, 18.) None reports that Officer Berryman was in a chokehold or being mobbed by other patrons. (*Id.*) In fact, Ms. Williams expressly disputes that either of these events occurred. (*Id.* at 18.) These

accounts are sufficient to present a fact issue as to whether the shooting was accidental or intentional.

Defendants raise objections to the consideration of this evidence, however. Their primary objection is that Plaintiffs failed, in discovery, to disclose the identities of Ms. Rasmussen and Ms. Jacobs as witnesses with information relevant to the claims and defenses in this litigation. (Doc. No. 28, at 1-2.) Under the Federal Rules, a party who fails to disclose a witness is not allowed to use that witness at trial "unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). Defendants seek exclusion of Ms. Rasmussen's and Ms. Jacobs's affidavits from the summary judgment record. (Doc. No. 28, at 2.) Ostensibly, Defendants will also object to Ms. Rasmussen and Ms. Jacobs testifying at trial.

The Court is very concerned about Plaintiffs' apparent failure to provide the names of Ms. Rasmussen and Ms. Jacobs to Defendants during the course of discovery. This failure is made even more perplexing by the fact that Plaintiffs' counsel provided Ms. Rasmussen's and Ms. Jacobs's names to an investigator for the Harris County District Attorney's Office two days after the shooting. (Doc. No. 28-1, at 2.) The Court believes that Plaintiffs must provide an explanation of why the omission was "substantially justified" or "harmless" in order to avoid some sanction under Rule 37 and has requested additional briefing from the parties.[9] (Doc. No. 29.) Because the Court has not yet ruled upon Defendants' objection, however, it will limit its analysis on summary judgment to whether Plaintiffs have successfully shown a fact issue as to Officer Berryman's intent absent Ms. Rasmussen's and Ms. Jacobs's accounts.

---

[9] Rule 37 does not obligate a court to exclude a witness if the witness was not properly disclosed, although it certainly contemplates that this would be the typical sanction for such failure. FED. R. CIV. P. 37(c)(1). If Rule 37 was indeed violated in this case, the Court will consider the circumstances surrounding Plaintiffs' failure to disclose, the prejudice visited upon Defendants, and the importance of the issues at the heart of this case before determining how best to address the violation.

Without Ms. Rasmussen and Ms. Jacobs, and assuming that Defendants' evidence is sufficient to carry their summary judgment burden, Plaintiffs must rely upon Ms. Williams to show an issue of fact regarding whether Officer Berryman intentionally fired his weapon at Ms. Brooks-Diamond. Although Ms. Williams was clearly disclosed to and known by Defendants, Defendants nonetheless object to her testimony on the basis that she lacks personal knowledge of the facts. (Doc. No. 28, at 6-7.) The Court finds this objection wholly unpersuasive. Within two to three minutes of the officers' arrivals at Club Eden, Ms. Diamond-Brooks had been shot. The relevant events occurred in a confined space, and in a compressed period of time. Ms. Williams may testify as to her personal observations. To the extent that her testimony is unclear or contradictory, Defendants are free to cross-examine on these points at trial.[10] At the summary judgment stage, the Court may not judge credibility or weigh competing evidence. *Reeves*, 530 U.S. at 150. Its task is limited to deciding whether Plaintiffs have identified "evidence on which [a] jury could reasonably find" that Officer Berryman intentionally fired his weapon at Ms. Diamond-Brooks. *Anderson*, 477 U.S. at 252. With Ms. Williams's affidavit, Plaintiffs have met their burden.

### B.  Because there is no evidence that Officer Berryman intended to shoot Ms. Gonzales, Defendants are entitled to summary judgment on her claims

While Plaintiffs' evidence demonstrates a factual dispute as to whether Officer Berryman intentionally fired his weapon at Ms. Diamond-Brooks, it is undisputed that Ms. Gonzales was

---

[10] Defendants suggest that Ms. Williams's affidavit is a "sham" affidavit because it conflicts with the statement she gave to police immediately after the shooting. (Doc. No. 28, at 6; Doc. No. 30 ("Reply"), at 3.) The Court disagrees that Ms. Williams's affidavit is irreconcilable with her purported on-scene statement, as recorded in the police reports. Therefore, the Court will not exclude Ms. Williams's affidavit under the "sham" affidavit doctrine, or consider it no evidence of the facts alleged within. *See Guerrero v. Total Renal Care, Inc.*, 932 F. Supp. 2d 769, 776 (W.D. Tex. 2013) ("[T]he sham-affidavit rule 'is applied sparingly' and may be invoked only where there is 'some inherent inconsistency between an affidavit and a deposition.'") (quoting *Axxiom Mfg., Inc. v. McCoy Invs., Inc.*, 846 F. Supp. 2d 732, 749-50 (S.D. Tex. 2012)).

simply an innocent bystander. She was not interacting with the officers at the time the gun discharged. She was wounded by the bullet only after it exited Ms. Diamond-Brooks. In short, there is no evidence to suggest that Officer Berryman targeted Ms. Gonzales in an attempt to "seize" her. Although Ms. Gonzales clearly suffered injury as a result of Officer Berryman's actions, her constitutional rights were not implicated. Defendants are entitled to summary judgment on her claims.

### C. Fact issues at to Officer Berryman's intent prevent him from invoking qualified immunity

The jury's determination of whether Officer Berryman intended to shoot Ms. Diamond-Brooks will also decide whether Officer Berryman may invoke qualified immunity. Qualified immunity protects a police officer from facing trial on an excessive force claim when a reasonable officer in his position would not have known that his conduct was unlawful under clearly established law. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). If Officer Berryman intentionally discharged his weapon at Ms. Diamond-Brooks—an unarmed woman who posed no serious physical threat to the officers or to other patrons—the safe harbor of qualified immunity is clearly unavailable to him. *See Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 488 (5th Cir. 2001) ("[D]eadly force violates the Fourth Amendment *unless* 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'") (quoting *Garner*, 471 U.S. at 11) (emphasis original). Defendants do not contend otherwise. (Mot. at 13 (arguing that Officer Berryman is entitled to qualified immunity because it was not clearly established, at the time of the shooting, that an *accidental* discharge could be deemed a seizure).)

### D. Chief Smiley did not participate in or cause Officer Berryman's alleged use of excessive force

Under Section 1983, supervisory officials are not liable for the actions of subordinates on a theory of vicarious liability. *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, the "misconduct of the subordinate must be affirmatively linked to the action or inaction of the supervisor." *Southard v. Tex. Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997). Supervisory liability may attach only if a supervisory official affirmatively participates in an act that violates the Constitution, or implements an unconstitutional policy that causes the plaintiff's injury. *Baker v. Putnal*, 75 F.3d 190, 199 (5th Cir. 1996). Defendants note that Chief Smiley was not present at Club Eden at the time of the shooting. He did not order or authorize Officer Berryman to use deadly force. And he did not implement any policy or custom which caused Officer Berryman to use deadly force. On the basis of these facts, Defendants seek summary judgment on the claims against Chief Smiley. (Mot. at 10-11.)

Plaintiffs do not dispute the facts recited by Defendants, but argue that Chief Smiley participated in the constitutional violation because he obstructed the investigation into the shooting. (Doc. No. 27, at 10-12.) According to Plaintiffs, an eyewitness to the shooting—Ashley Rasmussen—approached Chief Smiley outside Club Eden that night. She tried to tell him what she saw. Twice, Ms. Rasmussen reports, Chief Smiley told her to "sit down" and "be quiet" if she knew what was best. Ms. Rasmussen left that night without telling any officer what she saw.[11] (Doc. No. 27-2, at 9.)

These actions, if true, are disturbing and disheartening. But they are insufficient to make Chief Smiley a participant in or a cause of Officer Berryman's use of deadly force. The

---

[11] As previously noted, Defendants have objected to Ms. Rasmussen's testimony. The Court includes her testimony in its analysis of the claim against Chief Smiley for purposes of thoroughness, without deciding whether Defendants' objection should be sustained or overruled.

constitutional tort alleged here is the unlawful use of deadly force, not any alleged efforts after the fact to protect Officer Berryman. Chief Smiley was not present at the time of the shooting. Plaintiffs have no evidence that his policies or actions prior to the shooting caused Officer Berryman to fire his service weapon. And Chief Smiley cannot be liable on the theory that he "ratified" Officer Berryman's conduct. *See Hobart v. City of Stafford*, 916 F. Supp. 2d 783, 799 (S.D. Tex. 2013). Because Chief Smiley played no *a priori* role in Officer Berryman's use of deadly force, he is entitled to summary judgment.

> **E.     Plaintiffs have not shown a triable issue of fact regarding their theory that the City of Webster ratified an excessive use of force**

Municipalities are considered "persons" subject to suit under Section 1983 for civil rights violations. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, "a municipality cannot be held vicariously liable for the constitutional torts of its employees or agents." *Gros v. City of Grand Prairie, Tex.*, 181 F.3d 613, 615 (5th Cir. 1999). This is because Section 1983 requires a showing that the defendant "subject[ed] or cause[d a plaintiff] to be subjected" to a deprivation of a federal right, *see* 42 U.S.C. § 1983, a requirement that "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Monell*, 436 U.S. at 692.

A municipality may be sued under Section 1983 if a constitutional violation is the result of a formal policy or governmental custom. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010). Although Plaintiffs alleged this theory of municipal liability in their original state court petition, they do not refer to it or support it with evidence in their opposition to Defendants' Motion. Plaintiffs therefore cannot avoid summary judgment on their unsubstantiated theory that municipal policies or customs caused Officer Berryman to use deadly force against Ms. Diamond-Brooks.

14

Instead, Plaintiffs argue that the City of Webster is liable under Section 1983 because it ratified Officer Berryman's actions after the fact. (Doc. No. 27 ("Opp."), at 13-23.) The ratification theory of municipal liability can be traced to the Supreme Court case *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988). In *Praprotnik*, a plurality of the Supreme Court recognized "a scenario in which a municipality could be held liable for a single episode of conduct initiated by a non-policymaker employee." *Milam v. City of San Antonio*, 113 Fed. App'x 622, 626 (5th Cir. 2004). The Court explained:

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Praprotnik*, 485 U.S. at 127 (emphasis in original).

The Court has had occasion to address the ratification theory at length, particularly in the context of an excessive force claim. As the Court noted in *Hobart v. City of Stafford*, the ratification theory is an uneasy fit in excessive force cases, as it is difficult to conceptualize how a policymaker's actions subsequent to the use of force can in any way be considered a "cause" of that use of force. *See* 916 F. Supp. 2d at 795. Nonetheless, as the Fifth Circuit has not delegitimized the ratification theory in excessive force cases, the Court will endeavor to assess whether Plaintiffs have provided sufficient evidence of ratification to survive summary judgment.

Although frequently argued, the ratification theory is rarely successful in excessive force cases. *See Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 848 n.2 (5th Cir. 2009); *Hobart*, 916 F. Supp. 2d at 798. This is due, at least in part, to the fact that a policymaker need do more than simply approve or condone a subordinate's use of force; he must also approve or condone

the basis on which the force was deployed. *See James v. Harris Cnty.*, 508 F. Supp. 2d 535, 554 (S.D. Tex. 2007) (noting that the ratification theory is only viable if the policymaker approved of the use of force despite "[knowing] that the shooting . . . was clearly excessive to [the officer's] apparent need to defend himself"); *Allen v. City of Galveston, Tex.*, Civil Action No. G-06-467, 2008 WL 905905, at *8 (S.D Tex. March 31, 2008) (similar); *see also Praprotnik*, 485 U.S. at 127 ("If the authorized policymakers approve a subordinate's decision *and the basis for it*, their ratification would be chargeable to the municipality because their decision is final.") (emphasis added). It is undisputed that Chief Smiley—a purported policymaker for the City of Webster[12]—evaluated Officer Berryman's conduct and concluded that he did not violate City policies and customs. (Doc. No. 21-1, at 38-39.) In other words, he "approved" the use of force—or, more accurately, absolved Officer Berryman of wrongdoing—on the basis that the shooting was accidental. But this does not end the ratification inquiry. When factual disputes are material to whether a conscious decision to employ force was excessive, the policymaker does not "ratify" unconstitutional behavior simply because he believes the officer's version of events, *see James*, 508 F. Supp. 2d at 554, even if that version is subsequently proven to be wrong. *See Peterson*, 588 F.3d at 848. Similarly, in this case, because there is a legitimate factual dispute as to whether Officer Berryman consciously employed force against Ms. Diamond-Brooks, the City has not "ratified" any unlawful behavior simply because it accepts Officer Berryman's account that the shooting was accidental. This is true even if the jury ultimately reaches a different conclusion.

---

[12] Defendants argue that the City's elected Council is the City's only policymaker. (Doc. No. 21 ("Mot.") at 21 n.5; Reply at 6 n.4, 7.) Because Defendants have not sufficiently supported this argument with evidence, and because it does not alter the Court's conclusion, the Court will assume that Chief Smiley is properly considered a policymaker for the City of Webster.

The question on summary judgment then becomes whether Plaintiffs have identified evidence sufficient for a jury to find that Chief Smiley approved Officer Berryman's use of force despite knowing that it was unlawful and excessive. *See McIntosh v. Smith*, 690 F. Supp. 2d 515, 534 (S.D. Tex. 2010) (granting summary judgment on municipal ratification theory because the plaintiff "failed to produce any evidence from which a reasonable factfinder could conclude" that the police department found the officer's actions reasonable despite "knowing that [the officer] had actually acted improperly"); *see also James*, 508 F. Supp. 2d at 554; *Allen*, 2008 WL 905905, at *8. When the use of force is arguably excessive *even under the officer's version of the facts*, this question is simplified. Thus, in *Hobart*, this Court found that the plaintiff's ratification theory survived summary judgment, because "a factfinder could conclude that, even on [the officer's] version of events, firing a weapon, while apparently losing consciousness, in response to being struck by a mentally ill individual who was known to be unarmed, without any awareness of where innocent bystanders were positioned, was 'manifestly indefensible.'" 916 F. Supp. 2d at 797 (quoting *James*, 508 F. Supp. 2d at 554); *see also Coon v. Ledbetter*, 780 F.2d 1158, 1162 (5th Cir. 1986) ("[The sheriff] defended his deputies afterward, but it is undisputed that in doing so he was accepting their version of what happened. Unlike almost any conceivable version of the *Grandstaff*[13] episode, that version did not show that the deputies' actions were manifestly indefensible.").

The difficulty in this case is that Officer Berryman's version of the facts admits no constitutional infirmity. And case law is clear that Chief Smiley is entitled to believe Officer Berryman's account, without thereby subjecting the City to municipal liability if he is incorrect.

---

[13] *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161 (5th Cir. 1985).

Plaintiffs again offer the testimony of Ashley Rasmussen as support for the allegation that Chief Smiley prevented a robust investigation into the shooting.[14] (Opp. at 11-12, 21-22.) As explained above, Ms. Rasmussen claims that Chief Smiley discouraged her from giving a statement about what she saw at Club Eden, twice warning her to "sit down" and "be quiet" if she knew what was best. (Doc. No. 27-2, at 9.) Plaintiffs also note inconsistencies in and weaknesses of the Webster Police Department's criminal and internal affairs investigation of the shooting. For example, the investigating detective—Detective Pray—concluded that no witness observed the shot being fired, despite the fact that the bar was, by all accounts, quite crowded at the time of the incident and despite the fact that at least one witness indicated that he had eyes on Officer Berryman when he fired his weapon. (Opp. at 20-21; Doc. No. 21-2, at 32.) Additionally, neither Det. Pray nor the internal affairs investigator spoke with Ms. Diamond-Brooks to get her side of the story.[15] (Doc. No. 27-2, at 3.) Plaintiffs compare these purportedly inadequate, half-hearted investigations with the thorough investigation performed by investigator Kirk Bonsal of the Harris County District Attorney's Office.

As the Court interprets Plaintiffs' argument, they appear to offer these facts—which are disputed by Defendants—as evidence that Chief Smiley and the Webster Police Department failed to thoroughly investigate the shooting. But failure to investigate is not ratification. Indeed, the Supreme Court has been clear that accepting a subordinate's actions without *any*

---

[14] As before, the Court includes Ms. Rasmussen's testimony in its analysis of the ratification claim against the City for purposes of thoroughness, without deciding whether Defendants' objection to her testimony should be sustained or overruled.

[15] The internal affairs investigator notes in his report that he attempted to interview Ms. Diamond-Brooks, but she refused to speak with him. (Doc. No. 21-2, at 66.) The Court credits, as required on summary judgment, Ms. Diamond-Brooks's testimony that no one from Webster Police Department attempted to interview her. (Doc. No. 27-2, at 3.)

18

investigation does not render the municipality liable for the subordinate's unconstitutional decision. *See Praprotnik*, 485 U.S. at 130 ("[T]he mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority[.]").

Nor is there any legal authority for subjecting a municipality to liability simply because it inadequately performs an investigation once it has been initiated.[16] Even assuming that Chief Smiley sided with Officer Berryman on incomplete information, Plaintiffs have no evidence that his decision would have differed if the investigations had been more robust. *See James*, 508 F. Supp. 2d at 546 (rejecting theory that municipality's alleged custom of under-investigating uses of force caused the plaintiffs' injuries because there was "no evidence that any of the investigation outcomes likely would have changed" if the investigations had been more thorough). Indeed, the fact that Investigator Bonsal's admittedly thorough investigation on behalf of the Harris County District Attorney resulted in no criminal charges against Officer Berryman[17] suggests the exact opposite conclusion—that Chief Smiley would have credited his officer's account even on a fuller record of the events in question.

Some Section 1983 plaintiffs have argued that inadequate use of force investigations—performed as a matter of course—may constitute a custom of "rubber stamping" use of force

---

[16] The Court does not wish to suggest that shoddy or inadequate investigation practices are irrelevant to the ratification inquiry. To the contrary, as the Court explicitly noted in *Hobart*, deviation from typical practices, or a pattern of behavior evincing willful ignorance, may bolster other evidence suggesting ratification. *See Hobart*, 916 F. Supp. 2d at 798 ("[O]nce a policymaker does initiate an investigation, surely this Court must be entitled to consider whether that investigation was merely a rubberstamping process."); *see also Santibanes*, 654 F. Supp. 2d at 613-14. But, as the Court reads *Praprotnik* and other relevant case law, poor investigation techniques alone are insufficient to provide Section 1983 recourse against a municipality.

[17] After investigating the February 27, 2011 shooting, Investigator Bonsal presented his findings to a grand jury for possible criminal charges against Officer Berryman. The grand jury no billed Officer Berryman. (Doc. No. 21-3, at 109.)

which then emboldens police officers to employ force with impunity. This theory may indeed be viable under Section 1983, although it often fails for lack of proof. *See, e.g., James*, 508 F. Supp. 2d at 545-48; *Davis v. Montgomery Cnty.*, Civil Action No. H:07-505, 2009 WL 1226904, at *6 (S.D. Tex. Apr. 30, 2009); *Allen*, 2008 WL 905905, at *5-6 & n.7. But the theory is not present in this case. Plaintiffs have identified no prior instances in which the Webster Police Department inadequately investigated uses of force, and they have provided no evidence that such a custom caused Officer Berryman to deploy deadly force against Ms. Diamond-Brooks. Because Plaintiffs simply have no evidence that Chief Smiley, on behalf of the City of Webster, approved a conscious and unlawful use of deadly force by Officer Berryman, summary judgment must be granted on their ratification theory.

## VI.    CONCLUSION

For the reasons discussed above, the Court finds that Defendants' Motion for Summary Judgment (Doc. No. 21) must be **GRANTED IN PART** and **DENIED IN PART**. Specifically, Defendants' Motion is **DENIED** as to Plaintiff Kimberley Diamond-Brooks's Fourth Amendment claim against Defendant Raymond Berryman. In all other respects, the motion is **GRANTED.**

   IT IS SO ORDERED.

   SIGNED in Houston, Texas, on this the sixth day of February, 2014.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE